UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| RAQUEL BRUBAKER, | ) | CIV. 10-5005-JLV |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner, Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

**INTRODUCTION**

On August 7, 2007, Ms. Brubaker filed an application for Supplemental Security Income ("SSI") benefits under Title XVI of the Social Security Act (the "Act"), 42 U.S.C. §§ 1381.  (Administrative Record, p. 137).[1]  She protectively filed her application on July 30, 2007, alleging disability since August 31, 1998.  (Docket 11, p. 1).  Ms. Brubaker previously filed for disability and SSI benefits on January 26, 2005.  Id.  The earlier application was denied and not appealed.  Id.

An evidentiary hearing on the 2007 application was held before an Administrative Law Judge ("ALJ") on May 20, 2009.  Id.  The ALJ issued his decision adverse to plaintiff on August 3, 2009.  Id.  The Appeals Council denied Ms. Brubaker's request for review.  Id.  The decision of the ALJ became

---

[1]The court will cite to information in the administrative record by referencing "AR, p. ____."  The parties have filed a Joint Statement of Material Facts ("JSMF") (Docket 11).

the final decision of the Commissioner.  Id.  Ms. Brubaker timely filed her complaint in district court.  (Docket 1).

The court issued a briefing schedule requiring the parties to file a joint statement of material facts ("JSMF").  (Docket 10).  If there were any disputed facts, the parties were required to attach a separate joint statement of disputed facts.  Id.  The parties filed their JSMF.  (Docket 11).  Ms. Brubaker then filed a motion for order reversing the decision of the Commissioner.  (Docket 17). Following briefing, the motion is ripe for resolution.

For the reasons stated below, the motion is granted in part and denied in part, and the matter is remanded to the Commissioner for further consideration consistent with this order.

## FACTUAL AND PROCEDURAL HISTORY

The parties' JSMF (Docket 11) is incorporated by reference.  Further recitation of salient facts is included in the discussion section of this order.

## STANDARD OF REVIEW

The Commissioner's findings must be upheld if supported by substantial evidence in the record as a whole.  42 U.S.C. § 405(g); Choate v. Barnhart, 457 F.3d 865, 869 (8th Cir. 2006).  The court reviews the Commissioner's decision to determine if an error of law was committed.  Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992).

"Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  Cox v. Barnhart, 471 F.3d 902, 906 (8th Cir. 2006) (internal

2

citation and quotation marks omitted).  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support the Commissioner's decision.  Choate, 457 F.3d at 869 (quoting Ellis v.Barnhart, 392 F.3d 988, 993 (8th Cir. 2005)).  The review of a decision to deny disability benefits is "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision . . . [the court must also] take into account whatever in the record fairly detracts from that decision."  Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001)).

It is not the role of the court to re-weigh the evidence and, even if this court would have decided the case differently, it cannot reverse the Commissioner's decision if that decision is supported by good reason and is based on substantial evidence.  Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005).  A reviewing court may not reverse the Commissioner's decision " 'merely because substantial evidence would have supported an opposite decision.' "  Reed, 399 F.3d at 920 (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995)).

## DISCUSSION

"Disability" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment [or combination of impairments] which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).  Although SSI is not

3

payable prior to the month following the month in which the application was filed, the ALJ is required to considered a claimant's complete medical history. 20 CFR §§ 416.335 and 416.912(d).

The Social Security Administration established a five-step sequential evaluation process for determining whether an individual is disabled. 20 CFR § 416.920(a)(4). If the ALJ determines a claimant is not disabled at any step of the process, the evaluation does not proceed to the next step as the claimant is not disabled. Id.

The same five-step analysis determines eligibility for Title II benefits as well as for Title XVI benefits. See House v. Astrue, 500 F.3d 741, 742 n.1 (8th Cir. 2007). The five-step sequential evaluation process is:

> (1) whether the claimant is presently engaged in a "substantial gainful activity"; (2) whether the claimant has a severe impairment—one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience); (4) whether the claimant has the residual functional capacity to perform . . . past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove there are other jobs in the national economy the claimant can perform.

Baker v. Apfel, 159 F.3d 1140, 1143-44 (8th Cir. 1998); see also 20 CFR § 416.920(a)(4)(i)-(v).

THE FIRST STEP

At step one, the ALJ must determine if the claimant is engaging in substantial gainful activity ("SGA"). 20 CFR § 416.920(b). SGA is defined as

"work activity that is both substantial and gainful."  20 CFR § 416.972.

"Substantial work activity is work activity that involves significant physical or

mental activities."  20 CFR § 416.972(a).  "Gainful work activity is work that is

usually done for pay or profit, whether or not a profit is realized."  20 CFR

§ 416.972(b).  If an individual has earnings from employment or

self-employment above a specific level set out in the regulations, it is presumed

claimant has demonstrated the ability to engage in SGA and is not disabled.

20 CFR §§ 416.974 and 416.975.  If claimant is not engaging in SGA, the

analysis proceeds to step two.

The ALJ determined Ms. Brubaker had not been engaged in substantial

gainful activity since July 30, 2007, the protective filing date of her 2007

application.  (AR, p. 12).  Thus, the evaluation proceeds to step two.

THE SECOND STEP

At step two, the ALJ must decide whether the claimant has a medically

determinable impairment that is severe or a combination of impairments that

are severe.  20 CFR § 416.920(c).  A medically determinable impairment can

only be established by an acceptable medical source.  20 CFR § 404.1513(a).

Accepted medical sources include, among others, licensed physicians.  Id.  An

impairment or combination of impairments is severe if it significantly limits an

individual's ability to perform basic work activities.  20 CFR § 416.921.  Basic

5

work activities focus on "the abilities and aptitudes necessary to do most jobs."

Id. at subsection (b).  Examples of those abilities and aptitudes are:

> (1)   Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
>
> (2)   Capacities for seeing, hearing, and speaking;
>
> (3)   Understanding, carrying out, and remembering simple instructions;
>
> (4)   Use of judgment;
>
> (5)   Responding appropriately to supervision, co-workers and usual work situations; and
>
> (6)   Dealing with changes in a routine work setting.

Id.  If a claimant has a severe impairment or combination of impairments which are severe, the analysis continues to step three.

The ALJ found Ms. Brubaker had a number of severe impairments which significantly limited her physical and mental ability to do basic work activities. (AR, p. 12).  These severe impairments are: "Degenerative disc disease of the cervical spine status post cervical fusions, Obesity, Depression, and Anxiety Disorder."  Id.

THE THIRD STEP

At step three, the ALJ determines whether claimant's impairment or combination of impairments meets or medically equals the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1.  20 CFR §§ 416.920(d), 416.925, and 416.926.  If a claimant's impairment or

6

combination of impairments meets or medically equals the criteria for one of

the impairments listed and meets the duration requirement of 20 CFR

§ 416.909, claimant is considered disabled.  If not covered by these criteria, the

analysis is not over, and the ALJ proceeds to the next step.

The ALJ determined Ms. Brubaker did not have an impairment or

combination of impairments which met or were medically equal to one of the

impairments listed in 20 CFR Part 404, Subpart P, Appendix 1.  (AR, p. 13).

Ms. Brubaker does not challenge that conclusion.  (Docket 17).

THE FOURTH STEP

Before considering step four of the evaluation process, the ALJ is

required to determine a claimant's residual functional capacity ("RFC").

20 CFR § 416.920(d).  RFC is a claimant's ability to do physical and mental

work activities on a sustained basis despite any limitations from her

impairments.  20 CFR 404.1545(a)(1).  In making this finding, the ALJ must

consider all of the claimant's impairments, including those which are not

severe.  20 CFR §§ 404.1545(e) and 416.945(e).  All of the relevant medical

and non-medical evidence in the record must be considered.  20 CFR

§§ 416.945(a)(3), 416.912(a), and 416.929.

In determining a claimant's RFC, the ALJ considers any medical opinions

and claimant's degree of functional limitation. 20 CFR §§ 416.927(a)(1) and (d).

"Medical opinions are statements from physicians and psychologists or other

7

acceptable medical sources that reflect judgments about the nature and severity of [claimant's] impairment(s), including [claimant's] symptoms, diagnosis, and prognosis, and what [claimant] can still do despite the impairment(s), and . . . physical or mental restrictions." 20 CFR § 416.927(a)(2). In weighing medical opinion evidence, the ALJ must consider the factors set forth in the regulations. 20 CFR § 416.927(d).

The next step in the analysis of mental impairments requires a determination as to the "degree of functional limitation resulting from the impairment(s)." 20 CFR §§ 416.920a(b)(2) and 404.1520a(b)(2). Rating of functional limitation evaluates the extent to which impairment "interferes with [claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." 20 CFR §§ 416.920a(c)(2) and 404.1520a(c)(2). The areas of function which are rated are identified as "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." 20 CFR §§ 416.920a(c)(3) and 404.1520a(c)(3).

The first of these three activities-daily living, social functioning, and concentration, persistence or pace-are rated on a five-point scale of "none, mild, moderate, marked and extreme" while the fourth activity-episodes of decompensation-is judged on a four-point scale of "none, one or two, three, four or more." 20 CFR §§ 416.920a(c)(4) and 404.1520a(c)(4). "Extreme" and "four or more" each "represents a degree of limitation that is incompatible

8

with the ability to do any gainful activity." Id.  A claimant entitled to benefits for a mental impairment must be rated in the "marked or extreme" categories in the first three areas and something more than "none" in the fourth area. 20 CFR §§ 416.920a(d)(1) and 404.1520a(d)(1).

"The ALJ should determine a claimant's RFC based on all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." Lacroix v. Barnhart, 465 F.3d 881, 887 (8th Cir. 2006) (quoting Strongson v. Barnhart, 361 F.3d 1066, 1070 (8th Cir. 2004)); see also Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007) (because RFC is a medical question, the ALJ's decision must be supported by some medical evidence of a claimant's ability to function in the workplace, but the ALJ may consider non-medical evidence as well); Guilliams, 393 F.3d at 803 ("RFC is a medical question, and an ALJ's finding must be supported by some medical evidence."). The ALJ "still 'bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence.' " Guilliams, 393 F.3d at 803 (quoting Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000)).

Medical opinions are considered evidence which the ALJ must evaluate in determining whether a claimant is disabled, the extent of the disability, and the claimant's RFC.  See 20 CFR § 416.927(a)(2).  All medical opinions are evaluated according to the same criteria, summarized as follows:

1.    whether the opinion is consistent with other evidence
       in the record;

2.    whether the opinion is internally consistent;

3.    whether the person giving the medical opinion
       examined the claimant;

4.    whether the person giving the medical opinion treated
       the claimant;

5.    the length of the treating relationship;

6.    the frequency of examinations performed;

7.    whether the opinion is supported by relevant evidence,
       especially medical signs and laboratory findings;

8.    the degree to which a non-examining or non-treating
       physician provides supporting explanations for their
       opinions and the degree to which these opinions
       consider all the pertinent evidence about the claim;

9.    whether the opinion is rendered by a specialist about
       medical issues related to his or her area of specialty;
       and

10.   whether any other factors exist to support or
       contradict the opinion.

See 20 CFR § 416.927(a)-(f); Wagner v. Astrue, 499 F.3d 842, 848 (8th Cir.

2007).

       The ALJ gave considerable weight to the January 2008 report of Richard

Gunn.  (AR, p. 13).  Mr. Gunn, a Disability Determination Services ("DDS")

medical consultant, completed a Psychiatric Review Technique form on

January 10, 2008.  Id.   This records review and form assessed Ms. Brubaker's

mental impairments.  (Docket 11, p. 18).  Mr. Gunn noted a medically determinable impairment was present that did not precisely satisfy the diagnostic criteria for dysthymia.[2]  (AR, p. 13).  Mr. Gunn also concluded a second medically determinable impairment was present, but it did not precisely satisfy the diagnostic criteria for anxiety.  (AR, p. 14).  "He wrote that she received medication management and counseling through primary care and her medications worked well."  (AR, p. 14).  Mr. Gunn noted that Ms. Brubaker was taking Effexor[3] and Trazadone[4] and doing well on those medications.  (Docket 11, p. 19).

Mr. Gunn opined Ms. Brubaker had no restrictions in her activities of daily living, no difficulties in maintaining social functioning and no episodes of decompensation of extended duration.  (AR, p.14; Docket 11, p. 18).  The

---

[2]"Dysthymia is a type of depression involving long-term, chronic symptoms that are not disabling, but keep a person from functioning at 'full steam' or from feeling good. Dysthymia is a less severe type of depression than what is accorded the diagnosis of major depression. However, people with dysthymia may also sometimes experience major depressive episodes, suggesting that there is a continuum between dysthymia and major depression."  MedicineNet.com.

[3]"Effexor [Venlafaxine] is prescribed for the treatment of depression, depression with associated symptoms of anxiety, generalized anxiety disorder, and social anxiety disorder."  MedicineNet.com.

[4]"Trazodone[Trazadone] is primarily used for the treatment of depression. It is sometimes prescribed as a sedative, and it is also used in combination with other drugs for the treatment of panic attacks, aggressive behavior, and agoraphobia (fear of being outside or of being in a situation from which escape would be impossible) . . . ."  MedicineNet.com.

record discloses that "Mr. Gunn reasoned that her complaints were seen as not severe as she was able to manage personal hygiene, household chores such as cleaning, cooking, and laundry as her pain allows, socializes and goes out of the house alone to do errands such as shopping and manages money, pays bills, and maintains a checking account. (Docket 11, p. 19) (emphasis added). Mr. Gunn "recognized chronic pain [also] contributed to Ms. Brubaker's dysthymia." (AR, p. 14; JSMF, p. 19) (emphasis added). Mr. Gunn reported Ms. Brubaker had mild limitation in maintaining concentration, persistence, or pace. (AR, p. 14; Docket 11, p. 19). Against this record, the ALJ concluded only that Mr. Gunn found "no restriction of activities of daily living, no difficulties in maintaining social functioning . . . ." (AR, p. 14).

The ALJ also relied heavily on the testimony of Dr. Houston. (AR, p. 14). Dr. Houston, a Ph.D. clinical psychologist, reviewed Ms. Brubaker's records and testified at the administrative hearing. (Docket 11, p. 19). He rendered an opinion as to her mental functioning on May 20, 2009. Id.

The ALJ reported "Dr. Houston testified that his review of the claimant's medical records indicated chronic pain[5] with a medically determinable impairment . . . [which] did not precisely satisfy the diagnostic criteria . . .

_____

[5]Dr. Houston agreed with Dr. Garry's diagnosis of chronic pain. (AR, p. 27).

Depression[6] . . .  and a [second] medically determinable impairment . . . [which] did not precisely satisfy the diagnostic criteria . . . of Anxiety Disorder[7] . . . ." (AR, p. 14).  Dr. Houston's actual testimony was that the first impairment was "dysthymia or depression NOS [not otherwise specified]."  (AR, p. 25).

The ALJ reported Dr. Houston concluded Ms. Brubaker had "<u>mild</u>[8] restriction of activities of daily living, <u>moderate</u>[9] difficulties in maintaining social functioning,[10] <u>moderate</u> difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation, each of extended duration."  (AR, p. 14) (emphasis added).  <u>See also</u> Docket 11, p. 19.  The ALJ found it was "Dr. Houston's opinion [Ms. Brubaker] . . .  could perform simple, routine, repetitive, tasks and follow simple instructions.  She could tolerate occasional contact with co-workers, supervisors, and the public whether

---

[6]The principal types of depression are major depression, dysthymia, and bipolar disease (also called manic-depressive disease).  MedicineNet.com.

[7]Anxiety disorder is a chronic condition characterized by an excessive and persistent sense of apprehension with physical symptoms such as sweating, palpitations, and feelings of stress.  It included agoraphobia and panic disorders.  MedicineNet.com.

[8]The Medical Source Statement of Ability to Perform Work-Related Activities (Mental) ("MSS") defines "mild" as "a slight limitation . . . but the individual can generally function well."  (AR, p. 778).

[9]The MSS defines moderate as "more than slight limitation . . . but the individual is still able to function satisfactorily."  (AR, p. 778).

[10]Dr. Houston testified Ms. Brubaker is "not <u>completely</u> unable to function independently outside of the home . . . ."  (AR, p. 26) (emphasis added).

face-to-face or on the phone." (AR, p. 17). Dr. Houston also testified Ms. Brubaker would need to have "something like production work where she can come in and has a set daily routine" and would require "simple, routine, repetitive work with no changes in the work, or very minimal changes in the work setting." (Docket 11, p. 19).

The ALJ wrote "[w]hen asked by the claimant's attorney, Dr. Houston said that there was no support in the record for the opinions by Dr. Garry . . . ." (AR, p. 17). Dr. Houston's actual testimony was he could not find Dr. Garry's limitations (severity of the impairments) were supported in the record. (AR, pp. 26-27). Dr. Houston did not do his own assessment to determine if Ms. Brubaker's psychological impairments were exacerbated by her chronic pain. (AR, p. 27).

At the Sioux San Hospital in Rapid City, South Dakota, Dr. Garry was Ms. Brubaker's treating psychiatrist. (Docket 11, p. 17). Dr. Garry saw her nine times over the course of three and one-half years beginning on January 6, 2006, with the last contact being April 6, 2009. Id. The specific records of those physician-patient visits are detailed in the JSMT. (Docket 11, pp. 11-16). The last visit was approximately six weeks prior to the hearing before the ALJ.

Dr. Garry completed a Medical Source Statement of Ability to do Work Related Activities (Mental). Id. at p. 17. His report indicated Ms. Brubaker's

impairment affected her ability to understand, remember, and carry out

instructions.  (AR, p. 778).  Those restrictions were identified as follows:

> moderate[11] difficulties in understanding and remembering simple
> instructions, carrying out simple instructions, and the ability to make
> judgments on simple work related decisions; and
>
> extreme[12] limitations on her ability to understand and remember
> complex instructions, carry out complex instructions, and the ability
> to make judgments on complex work-related decisions.

Id. at p. 18 (emphasis added); see also AR, p. 778.  Dr. Garry supported these

opinions by stating "[Ms. Brubaker] has fairly prominent anxiety that impairs

her ability to function around other people.  It is common for her to completely

withdraw from everyone in her life because of paralyzing attacks of anxiety."

(Docket 11, p. 18); see also AR, p. 778.

Dr. Garry also concluded the impairment affected her ability to interact

appropriately with supervisors, co-workers, and the public, as well as respond

to changes in a routine work setting.  (AR, p. 779).  Those areas on the MSS

were evaluated as follows:

> marked[13] restrictions in interacting appropriately with the public and
> interacting appropriately with co-workers; and

---

[11]See footnote 9.

[12]The MSS defines extreme as "a major limitation . . . . There is no useful
ability to function in this area."  (AR, p. 778).

[13]The MSS defines marked as "a serious limitation . . . . There is a
substantial loss in the ability to effectively function."  (AR, p. 778).

<u>extreme</u> restrictions in her ability to interact appropriately with supervisor(s) and respond appropriately to usual work situations and to changes in a routine setting.

(Docket 11, pp. 17-18) (emphasis added); <u>see also</u> AR, p. 779.  The ALJ erroneously reported Dr. Garry concluded Ms. Brubaker "had <u>moderate</u> restrictions in her ability to interact appropriately with the public and with co-workers." (AR, p. 17) (emphasis added).  Dr. Garry concluded:

> [Ms. Brubaker] has severe anxiety attacks that impair her ability to control her fears–especially when alone around other people. This anxiety also impairs her ability to respond to directions, constructive criticism, or any communication attempts.  [Ms. Brubaker] develops shortness of breath, flushing, irrational fear, racing heart and ultimately as [sic] sense that she is going to die during these attacks.

(Docket 11 at p. 18; <u>see also</u> AR, p. 779).  Dr. Garry opined these limitations had been present since at least November 2007.  Id.

The ALJ chose to accept Dr. Houston's testimony and gave no weight to Dr. Garry's opinions.  (AR, p. 17).  The ALJ chose to accept the testimony of Dr. Houston over Dr. Garry for the following reasons:

1. The claimant has received medications for anxiety and depression from her primary care physicians for many years.

2. There are virtually no records of any counseling.  If the claimant had such "extreme" restrictions, one would assume that she would be in extensive counseling or even have been hospitalized.

3. Further, it is not credible to think that she could certainly manage her benefits or monies when she was purportedly afraid to even go out.

> 4.    Dr. Garry's own note in April 2009 indicates that she is
>        doing well overall.

(AR, p. 17).

The court will review the ALJ's reasons for accepting Dr. Houston's testimony over that of Dr. Garry, Ms. Brubaker's treating psychiatrist.

1. <u>Medications</u>.  The ALJ identified Ms. Brubaker was "taking various prescription medications. . . . The side effects make her tired and shaky." (AR, p. 17).  In response to the ALJ's questioning, Ms. Brubaker testified the side effects of the medications "make[] me very tired" and "nausea and stomach . . . pains" and "they just make me really shaky."  <u>See</u> Docket 11, p. 22 and AR, pp. 32-33.

Ms. Brubaker was not only taking prescription medications for depression and anxiety, but also for chronic pain and her longstanding intestinal problems.  Both Dr. Garry and her primary care physicians at Sioux San Hospital prescribed medication for Ms. Brubaker's physical and mental impairments.  Those medications and their side effects, as developed from the administrative record (together with the brand name, generic name and side effects from accepted medical literature) as of the date of the administrative hearing are:

> <u>Phenergan (Promethazine)</u> is prescribed for treating nausea or
> vomiting, motion sickness, and allergic reactions and for sedation.
>
> <u>Ibuprofen</u> is an over the counter pain medication taken as needed for
> pain and headaches.

17

Baclofen . . . [relaxes] skeletal muscles . . . . In addition to the risk of depressing brain function, the use of baclofen and tricyclic antidepressants (for example, amitriptyline [Elavil, Endep], doxepin [Sinequan, Adapin]) together may cause muscle weakness.

Tramadol is used in the management of moderate to moderately severe pain. . . . Tramadol may increase central nervous system and respiratory depression when combined with alcohol, anesthetics, narcotics, tranquilizers or sedatives.

Clinoril (Sulindac) is a nonsteroidal anti-inflammatory drug . . . used for the short and long term treatment of pain . . . .

Trixaicin cream is a topical ointment for muscle and joint pain;

Lidocaine Patch helps to reduce sharp/burning/aching pain as well as discomfort caused by skin areas that are overly sensitive to touch . . . . It works by causing a temporary loss of feeling in the area where you apply the patch.

Seroquel (Seraquil) (Quetiapine) is used alone or in combination with other drugs to treat schizophrenia and bipolar disorder.

Flexeril (Cyclobenzaprine) is a muscle relaxant. . . . for short-term relief of muscle spasms associated with acute painful muscle and skeletal conditions.

Robaxin (Methocarbamol) relaxes muscles to decrease muscle pain and spasms associated with strains, sprains or other muscle injuries.

Endep (Amitriptyline) is an antidepressant drug. . . . used to elevate the mood of patients with depression.
Vicoprofen (Hydrocodone) is used for the treatment of mild to moderate pain. . . . Hydrocodone, like other narcotic pain-relievers, interacts with other medications and drugs that slow the brain's processes, such as alcohol, barbiturates, skeletal muscle relaxants including carisoprodol (Soma), cyclobenzaprine (Flexeril), and benzodiazepines (e.g. lorazepam, Ativan; clonazepam, Klonopin).

Effexor (Venlafaxine) is prescribed for the treatment of depression, depression with associated symptoms of anxiety, generalized anxiety disorder, and social anxiety disorder.

Zantac (Ranitidine) blocks the action of histamine on stomach cells, thus reducing stomach acid production.

Desyrel (Trazodone) is primarily used for the treatment of depression. It is sometimes prescribed as a sedative, and is also used in combination with other drugs for the treatment of panic attacks, aggressive behavior and agoraphobia.

See Docket 11, *passim*; MedicineNet.com.  The ALJ's conclusion minimizing the extent of Ms. Brubaker's drug therapy and its effect upon her is not consistent with nor supported by the substantial weight of the administrative record.

2.  Counseling/Hospitalization.  Neither Dr. Houston nor the other consultants for the Social Security Administration suggested a lack of intensive counseling or hospitalization were indicative of the intensity of Ms. Brubaker's two mental impairments, depression and anxiety.  Rather, the ALJ interjects the absence of counseling and hospitalization as part of his own basis for wholly rejecting Dr. Garry's conclusions.  "[T]he ALJ must not substitute his opinions for those of the physician."  Ness v. Sullivan, 904 F.2d 432, 435 (8th Cir. 1990).  "A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight."  Jenkins v. Apfel, 196 F.3d 922, 924-25 (8th Cir. 1999).  "By contrast, the opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence."  Id. at p. 925 (internal quotation marks omitted) (emphasis added).  First treating with her general practice doctors and then being referred to, consulting with, and being under the care of a psychiatrist is "counseling."  The

19

course and manner of treatment is for the treating physician to decide, not the ALJ.  <u>Ness</u>, 904 F.2d at 435.  The court agrees with Ms. Brubaker that the ALJ's speculation about what treatment should, or should not, have occurred is not a valid reason to reject Dr. Garry's opinions.

  3.  <u>Management of Personal Funds</u>.  The ALJ engaged in circular reasoning by suggesting Ms. Brubaker's mental impairments cannot be as bad as Dr. Garry asserts because Dr. Garry suggests she should be able to handle her own affairs and funds.  Yet, the ALJ agreed with Dr. Garry that Ms. Brubaker has severe impairments of depression and anxiety in addition to her severe physical impairments.  (AR, p. 12).  Because Dr. Garry concludes Ms. Brubaker's severe impairments significantly restrict her social relationships does not mean she cannot perform banking tasks associated with managing her own funds.

  "[T]he ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work."  <u>Hogg v. Shalala</u>, 45 F.3d 276, 278-79 (8th Cir. 1995) (citing <u>Harris v. Secretary of DHHS</u>, 959 F.2d 723, 726 (8th Cir. 1992) ("The fact that a claimant . . . cooks, cleans, shops, does laundry, and visits friends does not in and of itself constitute substantial evidence that a claimant possesses the residual functional capacity to engage in substantial gainful activity.") and <u>Thomas v. Sullivan</u>, 876 F.2d 666, 669 (8th Cir. 1989) ("a

claimant need not prove she is bedridden or completely helpless to be found disabled. . . . The ability to do light housework with assistance, attend church, or visit with friends on the phone does not qualify as the ability to do substantial gainful activity.").  In similar fashion, being able to handle her own checking account and engaging in the infrequent types of social interaction one would expect between a bank teller and customer does not undermine Dr. Garry's opinions.

4. <u>Doing Well</u>.  The ALJ used out of context Dr. Garry's statement that Ms. Brubaker was "overall doing well" during her April 6, 2009, appointment. (AR, p. 784).  During the previous appointment on February 4, 2009, Dr. Garry reported:

> [Ms. Brubaker was] [s]till having profound anxiety while out in public especially.  This gets to the point that she is unable to function and leaves the situation often before completing her reason for going out. The anxiety is seemingly becoming more like a panic disorder overall. The attacks are more severe to the point that she often has to leave immediately before feeling that she is going to die.  Seroquel is really helping . . . . Mood OK.  Affect anxious.

(AR, p. 782).

> During the April 6, 2009, appointment, Dr. Garry reported:

> Feeling OK on her current regimen.  Has been getting anxiety attacks at night but is getting to the point that she can head it off before it develops into anything substantial.  Overall doing well.  Living with her mother.   Trying to get a home so she can be on her own.  No other complaints or side effects to report . . . Mood OK.  Affect full range.

(AR, p. 784).  The ALJ seemingly ignored Dr. Garry's statement Ms. Brubaker was still "getting anxiety attacks at night but is getting to the point that she can head it off before it develops into anything substantial."  Id.

It was after these appointments that Dr. Garry issued his mental status report for use by the Social Security Administration.  There is nothing inconsistent or irregular in reporting a patient has experienced anxiety attacks and then is getting better–at least to the point the attacks are reduced in number or only occurring at night.  It is evident Dr. Garry was looking at the big picture when he expressed his diagnostic conclusions in May of 2009.  Dr. Garry has not expressed a contrary opinion or treated Ms. Brubaker differently during the course of their physician-patient relationship.

"[T]he ALJ may reject the opinion of any medical expert where it is inconsistent with the medical record as a whole."  Finch v. Astrue, 547 F.3d 933, 938 (8th Cir. 2008).  There are two recognized requirements to this general rule:

> [A]n ALJ's decision to discount or even disregard the opinion of a treating physician [may be upheld]  (1) where other medical assessments are supported by better or more thorough medical evidence, or (2) where a treating physician renders inconsistent opinions that undermine the credibility of such opinions.

Wagner v. Astrue, 499 F.3d 842, 849 (8th Cir. 2007) (internal citation omitted).

"As a general matter, the report of a consulting physician . . . does not constitute 'substantial evidence' upon the record as a whole, especially when

22

contradicted by the evaluation of the claimant's treating physician." Id. (internal citation omitted).  In this case, the "other medical assessments" (Dr. Erickson and Dr. Whittle, both in 2008) were consultants who neither examined Ms. Brubaker nor treated her conditions.  Rather, they were records reviewers who expressed opinions based on the status of the records before them.  Obviously not available to these consulting physicians was the balance of Dr. Garry's 2008 and 2009 treatment records.  Thus, these earlier consultant assessments were not "better or more thorough medical evidence" as contemplated by Wagner.  Id. at p. 849.  The same conclusion applies to Dr. Houston.

Dr. Garry never expressed inconsistent opinions throughout his course of care and treatment of Ms. Brubaker.  Id.  Rather, his diagnosis always focused on depression and anxiety.  The medications prescribed were always drugs used to treat Ms. Brubaker's depression, anxiety and chronic pain.[14]  Dr. Garry is the only physician who had the opportunity to examine, speak with and observe Ms. Brubaker.  These activities are an important component in the evaluation process of a physician and, particularly, a psychiatrist.  See 20 CFR § 416.927(a)-(f) and Wagner, 499 F.3d at 848.

---

[14]Dr. Houston acknowledged Ms. Brubaker had chronic pain which was being treated by Dr. Garry.  (AR, p. 27).

23

The court must "defer to an ALJ's credibility finding[s] as long as the ALJ . . . gives a good reason [for those findings]." Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007) (internal citation and quotation marks omitted).  The ALJ is not entitled to pick and choose what portion of a document or testimony he wishes to accept as factually accurate while ignoring related information in the same document or from a medical care provider.  Reed v. Barnhart, 399 F.3d 917 (8th Cir. 2005); Haley v. Massanari, 258 F.3d 742 (8th Cir. 2001).

"A treating physician's opinion is given controlling weight 'if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.' " House v. Astrue, 500 F.3d 741, 744 (8th Cir. 2007) (quoting Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005)); see also 20 CFR § 416.927(d)(2).  "The opinion of an acceptable medical source who has examined a claimant is entitled to more weight than the opinion of a source who has not examined a claimant." Lacroix, 465 F.3d at 888 (citing 20 CFR §§ 404.1527(d)(1), 416.927(d)(1)), Shontos v. Barnhart, 328 F.3d 418, 425 (8th Cir. 2003), and Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998)).  The ALJ's reasons for choosing Dr. Houston's testimony over the medical records and report of Dr. Garry are not supported by the record.  Wagner, 499 F.3d at 849.  Because Dr. Garry's opinions, as Ms. Brubaker's treating physician, are consistent with the medical records as a whole, the ALJ improperly rejected Dr. Garry's

24

conclusions.  <u>Finch</u>, 547 F.3d at 938.  In accordance with these conclusions, the ALJ must give Dr. Garry's opinions "controlling weight."  20 CFR § 404.1527(d)(2).

The ALJ also found Ms. Brubaker "not credible on her asserted limitations." (AR, p. 18).  This conclusion was premised on the following declaration:

> [C]laimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(AR, p. 17).  The ALJ accepted Dr. Erickson's RFC of January 10, 2008.  (AR, p. 16).  This was a paper review and Dr. Erickson did not examine Ms. Brubaker. (Docket 11, p. 17).  Dr. Erickson did not have the benefit of Ms. Brubaker's medical records from May 6, 2008, to the date of the hearing.  <u>See</u> Docket 11, pp. 13-18.

Dr. Erickson's RFC concluded, in relevant part, Ms. Brubaker could perform the following physical activities:

<u>occasionally</u>[15] lift and/or carry (including upward pulling) <u>20 pounds</u>;

---

[15]"Occasionally" is defined for RFC purposes as "occurring from very little up to one-third of an 8-hour workday (cumulative, not continuous).  (AR, p. 226).

frequently[16] lift and/or carry (including upward pulling) 10 pounds;

stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday;

sit (with normal breaks) for a total of about 6 hours in an 8-hour workday;

push and/or pull (including operation of hand and/or foot controls) unlimited other than as shown for lift and/or carry;

frequently climb ramps/stairs;

occasionally climb ladders or scaffolds (avoid all exposure to climbing ropes); and

frequently balance, stoop, kneel, crouch, or crawl.

(AR, p. 16) (emphasis added).  The 2008 RFC was based on Ms. Brubaker's spinal injuries at C4, C5, C6, and C7, with surgical fusions at C4-5 and C5-6, and "depression which is stable at this time." (AR, p. 227).  Dr. Erickson wrote "[h]er depression may be playing a part in her symptoms."[17] Id. at p. 231.  Dr. Erickson reported that Ms. Brubaker "is able to complete all her ADLs [activities of daily living] as her pain allows." (AR, pp. 227-28) (emphasis added).

---

[16]"Frequently" is defined for RFC purposes as "occurring one-third to two-thirds of an 8-hour workday (cumulative, not continuous). (AR, p. 226).

[17]It is assumed these symptoms would be Ms. Brubaker's back pain, headaches, fatigue, and anxiety attacks which were reported in her historical medical records to the date of Dr. Erickson's RFC.  See Docket 11, pp. 2-13.

Dr. Erickson reported no communication limitations.  (AR, p. 230).
However, on February 4, 2009, Dr. Garry noted Ms. Brubaker was "still having
profound anxiety while out in public especially.  This gets to the point that she
is unable to function and leaves the situation often before completing her
reason for going out."  (Docket 11, p. 15).  That entry also noted "the anxiety is
seemingly becoming more like a panic disorder overall.  She said that the
attacks are more severe to the point that she often has to leave
immediately before feeling she is going to die."  Id.

Surely, Dr. Erickson would not have reported Ms. Brubaker had "no
communication limitations" if he had been aware of these profound social
consequences to Ms. Brubaker.  Yet the ALJ chose to accept Dr. Erickson's
RFC conclusions, rejecting consideration of Dr. Garry's treating physician
observations.

The ALJ failed to consider these post-RFC report medical records in
constructing the ALJ's own RFC assessment, which was different than the one
developed by Dr. Erickson.  The ALJ's own RFC, with normal work breaks, is
summarized in pertinent part, as follows:

occasionally lift and/or carry 10 pounds;

frequently lift and/or carry less than 10 pounds;

stand and/or walk for 2-4 hours total in an 8-hour workday;

sit for at least 6 hours in an 8-hour workday;

push/pull has the <u>same exertional limitations</u> as lift and/or carry;

<u>frequently</u> climb ramps/stairs and never climb ladders, ropes, or scaffolds;

<u>frequently</u> balance, stoop, kneel, crouch, or crawl;

<u>occasionally</u> reach overhead with either arm;

<u>no</u> manipulative, visual, or <u>communicative limitations</u>;

<u>tolerate occasional contact</u> with co-workers, supervisors, and the public (face-to-face or by phone); and

able to perform simple, routine, repetitive tasks (with few if any changes in the job, tasks, or work setting).

(AR, p. 23) (emphasis added).  This RFC contains lower lifting standards for both "occasionally" and "frequently," and a shorter standing/walking standard than Dr. Erickson recommended.  In building this RFC, the ALJ relied on Dr. Houston's conclusions and gave no weight to Dr. Garry's opinions.  <u>Id.</u> at 17.

Because the court finds Dr. Garry's opinions are entitled to greater weight and consideration than Dr. Houston's conclusions, the ALJ's self-constructed RFC is likewise erroneous.  <u>Krogmeier v. Barnhart</u>, 294 F.3d 1019, 1024 (8th Cir. 2002) ("the ALJ erred in determining the claimant's residual functional capacity without relying on reliable medical evidence and the aid of a professional.").  The ALJ then judged Ms. Brubaker's testimony against an improperly developed RFC.  If the ALJ had properly considered Dr. Garry's opinions, the ALJ would have adopted a RFC more akin to Dr. Garry's assessment than the conclusions of the non-treating physicians.  <u>Jenkins v.</u>

28

Apfel, 196 F.3d 922, 924 (8th Cir. 1999).  The non-treating physicians'
assessments "cannot be considered substantial evidence in the face of the
conflicting assessments of a treating physician."  Id. at p. 925.

The ALJ properly cited the factors relevant to judging a claimant's
subjective complaints.[18]  However, once cited, the ALJ failed to consider those
factors in light of the "evidence as a whole."  Polaski v. Heckler, 739 F.2d 1320,
1322 (8th Cir. 1984).  Dr. Garry provided "direct medical evidence of [the]
cause and effect relationship between the impairment and degree of claimant's
subjective complaints . . . ."  Id.  The ALJ simply does not articulate how, if at
all, Ms. Brubaker's subjective complaints of chronic pain are inconsistent with
the medical records.  To the contrary, Ms. Brubaker's medical records show a
course and pattern of severe, debilitating, chronic pain–through her cervical
disk fusions and post–surgical residual pain, as well as her depression and
anxiety disorder–and its impact on her physical and mental activities.

---

[18]"The Regulations provide the following factors that must be considered
in such evaluation by the Administrative Law Judge: (i) the claimant's activities
of daily living; (ii) the location, duration and frequency and intensity of pain or
other symptoms; (iii) precipitating and aggravating factors; (iv) the type, dosage,
effectiveness and side effects of medications taken to alleviate pain or the other
symptoms; (v) treatment, other than medication, for the relief of pain or other
symptoms; (vi) any measures other than medication used to relieve pain or the
other symptoms; and (vii) any other factors concerning functional limitations
and restrictions due to pain or other symptoms produced by the medically
determinable impairments (SSR 85-16); See also Polaski v. Heckler, 739 F.2d
1320, 1322 (8th Cir. 1984)."  (AR, p. 16).

29

It is undisputed Ms. Brubaker's chronic pain and psychiatric conditions are not well-controlled with medication and no other treatment has been recommended by her general practitioner or treating psychiatrist. See Hutton v. Apfel, 175 F.3d 651, 655 (8th Cir. 1999) (holding that impairments well-controlled with treatment do not support a finding of total disability); Williams v. Sullivan, 960 F.2d 86, 89 (8th Cir. 1992) (holding that a claimant's mental disorder was not disabling in the absence of treatment beyond prescription medication).

The ALJ also seems to place significance on Ms. Brubaker's smoking. The ALJ commented that in 2002 "Dr. Rice noted that the claimant smoked and declined nicotine replacement therapy." (AR, p. 12). "[Ms. Brubaker] was smoking one pack a day and had smoked for 20 years." Id. The ALJ apparently did not give credit to Ms. Brubaker's May 2009 testimony that she "still smoked about 4 cigarettes a day and said she was trying to quit." Id. at p. 18. Four cigarettes is a far cry from a full pack of cigarettes a day and is an indication of her effort to abide by her physician's recommendation. There is no other notation in Ms. Brubaker's medical records to recommend strongly, or even suggest for that matter, that she needed to totally quit smoking to achieve any success with her medication or treatment.

Ms. Brubaker's medical records do not disclose any significant failure on her part to seek out medical care or to follow her doctors' treatment plans. Her

physicians' prescriptions for pain medications and psychotropic drugs are strong evidence of the physicians' analyses of the severity of her chronic pain and psychiatric conditions.  See Wingert v. Bowen, 894 F.2d 296, 299 (8th Cir. 1990) (ALJ may properly consider whether a claimant requires regular medications or visits to physician); Williams v. Bowen, 790 F.2d 713 (8th Cir. 1986) (merely occasional use of prescription pain medication is properly considered when weighing a claimant's credibility).  Ms. Brubaker's subjective testimony of chronic pain and its effect upon her activities of daily living need to be examined in light of Dr. Garry's medical records and testimony, which the court has ruled are entitled to credibility and substantial weight.  Polaski, 739 F.2d at 1322.

Pursuant to sentence four of 42 U.S.C. § 405(g),[19] the court reverses and remands to the Commissioner for further administrative proceedings.  Upon remand, the ALJ is instructed to consider Dr. Garry's findings and opinions, giving them greater weight than the report of Dr. Erickson or the testimony of Dr. Houston, and to further evaluate plaintiff's subjective complaints and provide rationale in accordance with 20 CFR § 404.1529 and Social Security Ruling 96-7p; give further consideration to plaintiff's maximum residual functional capacity in light of Dr. Garry's conclusions and provide an

---

[19]"The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

appropriate rationale with specific references in support of the assessed

limitations; and if warranted, obtain supplemental vocational expert testimony.

## CONCLUSION

Accordingly, it is hereby

ORDERED that plaintiff's motion (Docket 17) is granted in part and

denied in part.

IT IS FURTHER ORDERED that the cause be reversed and remanded to

the Commissioner for further administrative action pursuant to sentence four

of 42 U.S.C. § 405(g) consistent with the decision set out above.

Dated March 30, 2011.

BY THE COURT:

/s/ *Jeffrey L. Viken*
JEFFREY L. VIKEN
UNITED STATES DISTRICT JUDGE